IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

YUGEN KAISHA, Y.K.F.,

        Plaintiff,

    v.

STEPHANIE DODSON,

        Defendant.

_____

STEPHANIE DODSON,

        Counter-Claimant,

    v.

YUGEN KAISHA, Y.K.F.,

        Counter-Defendant.

_____

MARTIN F. TRIANO, d/b/a LAW
OFFICES OF MARTIN F. TRIANO,

        Plaintiff Intervenor,

    v.

YUGEN KAISHA, Y.K.F., and
STEPHANIE DODSON,

        Intervenor Defendants.

_____

Case No. 08-0225 SC

MEMORANUM OF DECISION,
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

## I.   INTRODUCTION

    In this suit, Plaintiff Yugen Kaisha, Y.K.F. ("YKF"), seeks to set aside a fraudulent transfer of shares in Smart Alec's Intelligent Food, Inc. ("Smart Alec's") between Alexander N. Popov ("Popov") and Defendant Stephanie Dodson ("Dodson").  Dodson

contends that she entered into a share purchase agreement with Popov, and thereby received all of Popov's interest in Smart Alec's, on April 18, 2004.  See Docket No. 84 ("Dodson Trial Br."). YKF contends that the agreement was actually executed around August of 2005, just weeks before Popov filed for personal bankruptcy, and that it was fraudulently backdated to avoid the appearance that the transfer was intended to protect the shares from Popov's creditors. See Docket No. 83 ("YKF Trial Br."); Adv. Docket No. 1 ("YKF Compl.").[1]  Dodson has asserted a counterclaim against YKF based on YKF's alleged bad-faith delay of a closing agreement for the redemption of YKF's separate Smart Alec's shares.  Adv. Docket No. 6 ("Dodson Answer").

Plaintiff-Intervenor Martin F. Triano, d/b/a Law Offices of Martin Triano ("Triano" or "LOMT") also seeks from this Court a declaratory judgment, to the effect that a promissory note between Triano and Popov establishes an enforceable lien against the shares in question.  Docket No. 22 ("Triano Compl."), 79 ("Triano Trial Br.").

The Court held a seven-day bench trial, lasting from January 19, 2010, to January 27, 2010.  The Court, by this memorandum of decision, issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court concludes that YKF has proven that the transfer of shares between Popov and Dodson was fraudulent.  Dodson has failed to establish that she is entitled to

---

[1] This case began as an adversary proceeding in bankruptcy court. Y.K.F. v. Dodson, Adversary Docket No. 07-3104 (Bankr. N.D. Cal.). Citations to documents from the underlying adversary proceeding will appear in the form "Adv. Docket No. XX."

any relief under her counterclaim.  In addition, Triano has proven that the shares in Smart Alec's are subject to a lien established by the promissory note between Triano and Popov.

## II.  **FINDINGS OF FACT**

### A.  **The Parties**

1.   Alexander Popov is an entrepreneur who started Smart Alec's Intelligent Foods, Inc.  Smart Alec's is a fast-food restaurant that focuses on serving healthy foods.  Popov started the business in 1996.  It originally sold only vegetarian items, although it later expanded its menu to include items such as poultry and tuna.  It is located one block from the campus for the University of California, Berkeley.  (test. of Popov).  Popov does not claim to currently possess any shares in Smart Alec's.

2.   YKF is a Japanese holding company that invests in a variety of types of businesses.  In 1996, YKF invested $720,000 in Smart Alec's, and received 25% of the outstanding stock in Smart Alec's.  (test. of Baymiller).[2]  YKF does not currently claim to possess any shares in Smart Alec's.

3.   Dodson currently holds title to 3,744,000 shares of common stock in Smart Alec's.  (test. of Dodson).  As far as this Court is aware, she is currently Smart Alec's sole shareholder.

4.   Dodson met Popov in 1996, and joined the board of directors for Smart Alec's around that same year.  She held various positions within Smart Alec's, and by 2004 she was serving as the

---

[2] Brian Baymiller ("Baymiller") is an employee of Fuji Silysia Chemical Ltd., in which YKF owns a 50% interest.  As discussed below, he later served as a director and the president of Smart Alec's.  (test. of Baymiller).  He testified as a witness for YKF in this trial.

company's vice president and secretary. She also served as the restaurant's operations manager, and oversaw many of the business's day-to-day operations. She held no shares in Smart Alec's prior to 2004. (test. of Dodson).

5. In 1999, Dodson and Popov began dating. They married each other in 2006. Id.

6. In October of 2001, Popov "caught" Barry Bonds' record-breaking seventy-third home run baseball.[3] The events surrounding the catch resulted in litigation over the ownership of the ball, in Popov v. Hayashi (the "Hayashi litigation"). (test. of Popov; test. of Triano). Popov sought and received representation by LOMT in this matter. (test. of Triano).

7. As described in further detail below, during 2002 and early 2003, Triano also represented Popov in two other matters, one involving Popov's separate business venture, Man.com (the

---

[3] A trial court that later considered the matter concluded that Popov's "catch" was not complete enough to perfect Popov's property interest in the ball. To quote from the trial court that considered this catch:

> When the seventy-third home run ball went into the arcade, it landed in the upper portion of the webbing of a softball glove worn by Alex Popov. While the glove stopped the trajectory of the ball, it is not at all clear that the ball was secure. Popov had to reach for the ball and in doing so, may have lost his balance. [¶] Even as the ball was going into his glove, a crowd of people began to engulf Mr. Popov. He was tackled and thrown to the ground while still in the process of attempting to complete the catch. Some people intentionally descended on him for the purpose of taking the ball away, while others were involuntarily forced to the ground by the momentum of the crowd.

Popov v. Hayashi, No. 400545, 2002 WL 31833731, *2 (Cal. Super. Ct. Dec. 18, 2002). The court ultimately concluded that Popov was entitled to a 50% ownership interest in proceeds from the ball, which was sold at auction. (test. of Popov).

4

"Man.com litigation"), and the other brought by YKF against Popov, Dodson, and Smart Alec's (the "YKF litigation"). (test. of Triano).

**B.   Popov's Shares in Smart Alec's**

8.   In 2002, YKF brought suit against Popov, Dodson, and Smart Alec's.  To resolve this dispute, YKF entered into a settlement agreement with Popov, Dodson, and Smart Alec's, which was executed on February 6, 2004.  Pl.'s Ex. 1 ("Settlement Agreement").

9.   The Settlement Agreement required Popov to surrender all control of Smart Alec's by stepping down as an officer and board member of the company, and by pledging all of the voting rights of his shares in Smart Alec's to YKF.  Id. §§ 2(b), 4. Smart Alec's would redeem YKF's shares (amounting to 25% of the total shares) for $775,000, payable from the profits of Smart Alec's, to be completed by December 31, 2008.  See Id. Ex. A ("Stock Redemption Agreement") § 1.  The Settlement Agreement also granted YKF a security interest in all of Popov's Smart Alec's shares.  Settlement Agreement § 2(b).  Popov personally guaranteed the first $285,000 that Smart Alec's would pay to YKF for the share redemption.  Id. § 2(c).

10.   While Popov and Dodson were negotiating the Settlement Agreement with YKF, in a letter dated November 18, 2003, Popov stated that "I have discussed the timing and repayment amount with Ms. Dodson and we feel confident that we can repay this amount within the specified timeframe."  Pl.'s Ex. 141 ("11/18/03 Letter") at 3.

11.   Pursuant to the Settlement Agreement, Popov resigned

**United States District Court**
For the Northern District of California

as CEO, president, and director of Smart Alec's, effective April 30, 2004. Settlement Agreement Ex. G ("Popov Resignation"). At this time, Baymiller became the president of Smart Alec's. (test. of Baymiller).

12. Although Dodson resigned as director, secretary, and vice president of Smart Alec's on February 6, 2004, she remained an employee of Smart Alec's and effectively ran the restaurant. Settlement Agreement Ex. H ("Dodson Resignation"); (test. of Dodson; test. of Baymiller).

13. After Popov ceased receiving paychecks from Smart Alec's, he ceased to have a stable source of income. He received only $32,231.61 from Smart Alec's in 2004 (prior to his resignation), and reported no additional income that year. See Pl.'s. Ex. 134 ("Payroll Record") at 6; Pl.'s Ex. 124 ("Second Am. Statement of Financial Affairs") at 2. His income was only $11,628.00 in 2005, which came from his work as a real estate broker. See Second Am. Statement of Financial Affairs at 2; (test. of Popov). When Popov later filed for bankruptcy in September of 2005, he indicated that his monthly income was only $1500, but his expenditures amounted to $2525. Pl.'s Ex. 123 ("Bankruptcy Petition") at 18-19.

14. Between April of 2004 and September of 2005, Dodson lent Popov between $10,000 and $13,000, which Popov never paid back. (test. of Popov; test. of Dodson).

15. Baymiller gave permission for Popov to provide only narrow services to Smart Alec's, which were limited to issues related to taxes for Smart Alec's two most recent fiscal years, during which Popov had controlled the company. (test. of

Baymiller).

16. Over the course of 2004, the evidence demonstrates that Popov remained very active in Smart Alec's, in excess of the help authorized by Baymiller. This includes working with the landlord on issues related to Smart Alec's lease, and working on projects to increase Smart Alec's revenue, including replacing the menu board and introducing beef to the restaurant's menu. For instance, on November 29, 2004, Popov wrote to Baymiller to contest a particular expense that Baymiller sought to charge Smart Alec's, and Popov cited the "extreme efforts we have been applying over the last six months by working late at night and on weekends. As you know, I have been directly involved in adding beef items to the menu and creating new menu's [sic]." Pl.'s Ex. 50 ("11/29/04 Email") at 3; see also Pl.'s Exs. 19 ("7/12/04 Email") (telling Baymiller that "we would like to implement improvements to grow Smart Alec's revenue" and naming improvements).[4]

17. On or around May 20, 2005, Popov first discussed with Baymiller the possibility of providing Dodson with shares in Smart Alec's. (test. of Popov; test. of Baymiller). This conversation occurred by telephone, and there is no record of its contents. Popov proposed the idea of altering the Settlement Agreement, to allow Dodson (instead of Smart Alec's) to receive

---

[4] The Court notes the tension between the facts found by this Court and the testimony provided by Dodson and Popov to the bankruptcy court on March 27, 2007 in Triano v. Popov, Adv. Adversary Docket No. 05-3485 (Bankr. N.D. Cal.). See Pl.'s Ex. 133 ("Test. Before Judge Carlson"). In that hearing, both Popov and Dodson described an extremely narrow scope of work that Popov provided for Smart Alec's, limited solely to fixing broken devices at the restaurant. Id. at 30:11-31:13, 74:5-11, 112:10-113:3. The tension between Dodson and Popov's prior testimony, and the overwhelming evidence on this point presented at this trial, serves to undermines the credibility of both Popov and Dodson.

YKF's shares in Smart Alec's as they were redeemed; Baymiller told Popov that YKF would probably not be interested in altering the Settlement Agreement. (test. of Baymiller). Popov contends that he instead told Baymiller that he had already sold the residual value of his shares to Dodson (at this time, YKF still possessed a security interest in the shares, as well as the share certificates). (test. of Popov). In light of the correspondences described below, the Court does not find Popov's testimony on this point to be credible.

18. On June 20, 2005, Popov wrote to Baymiller, and touched upon his ongoing fee dispute with Triano. Pl.'s Ex. 54 ("6/20/05 Email") at 1. Popov stated that he was considering filing for personal bankruptcy if he could not come to an agreement with Triano soon. Id. He wrote that, "[s]ince YKF is in possession of my shares of stock, YKF is a secured creditor and those shares would not be brought into the bankruptcy proceeding." Id. The email does not suggest that Popov had sold his shares to Dodson by that time. Indeed, if Popov had already transferred the shares to Dodson, then there would have been no need to discuss the impact of YKF's possession of those shares upon the disposition of those shares in Popov's bankruptcy proceeding.

19. During a meeting between Baymiller, Yasuo Ezaki ("Ezaki")[5] and Dodson at Smart Alec's around June of 2005, Dodson did not indicate that she had any shares in Smart Alec's, even though the attendees specifically discussed the current state of stock ownership in the company. (test. of Ezaki). During the

---

[5] Ezaki was also an employee of Fuji Silysia Chemical Ltd., and became an officer of Smart Alec's after the Settlement Agreement. (test. of Ezaki).

8

meeting, Dodson indicated that she was determined to ensure that Smart Alec's would pay off the redemption amount to YKF, because she would probably marry Popov. Id. This suggests both that Popov and Dodson continued to have a romantic relationship in 2005, and that it was Popov, and not Dodson, who owned the Smart Alec's shares at this time.

20. Dodson testified that, at the June 2005 meeting, Baymiller asked her if she had any shares of stock in Smart Alec's, and she answered "no." (test. of Dodson). However, she says that she explained to Baymiller that she held the "residual value of the shares of stock" that Popov had possessed, and that she would own the stock after Smart Alec's had completed the redemption of YKF's shares. Id. There is no record of this conversation. Baymiller denies that Dodson made this disclosure. (test. of Baymiller). Ezaki denies that Dodson informed them of an agreement to purchase Popov's shares. (test. of Ezaki). The Court does not find Dodson's testimony on this point to be credible.

21. After the meeting, Popov wrote Baymiller and Ezaki on July 11, 2005, because Dodson had "indicated there was some clarification that was needed from" Popov. Pl.'s Ex. 56 ("7/11/05 Email") at 1. In particular, he stated:

> The discussion regarding Stephanie and ownership of the shares is with respect to the residual value of my shares. Currently, my shares are pledged to YKF, and the Smart Alec's Corporation is buying back YKF's shares. After the buyback is complete, YKF's shares will have been repurchased by the corporation, my shares will return to me and since the corporation has bought back YKF's shares, the only shareholder after the redemption would be me. My discussion regarding Stephanie has to do with selling the right to own the shares after the redemption period, such that Stephanie is the only shareholder of the shares

1           after the redemption period, not me.

2    Id. at 1.  Baymiller testified that he read this email to indicate

3    that Popov was considering selling his interest in the shares to

4    Dodson in the future.  (test. of Baymiller).  The Court agrees that

5    this is the most natural reading of the email.  Popov was

6    recounting the "current" arrangement when he stated that "my shares

7    will return to me and . . . the only shareholder after the

8    redemption would be me."  See 7/11/05 Email at 1.

9          22.  Over several correspondences between Popov and

10   Baymiller in mid-August, Popov proposed a method for eliminating

11   Triano's claimed lien upon his shares, whereby YKF would foreclose

12   upon the shares and Dodson would gradually earn them back over the

13   following years.  See Pl.'s Ex. 65 ("8/18/05 Email") at 1.

14   Baymiller responded that he was not comfortable with this proposal,

15   and that he expected that it would be too risky for YKF.  See Pl.'s

16   Ex. 69 ("8/25/05 Email") at 1.  Baymiller also stated that he was

17   "not convinced that we have the power to obtain your shares."  Id.

18   Given that the transfer of the shares was a basis for default under

19   the Settlement Agreement, see Settlement Agreement Ex. C ("Stock

20   Pledge Agreement") § 5(b), the Court finds that Baymiller's

21   reaction supports his testimony that he was not aware of any

22   transfer of shares between Popov and Dodson at that time.

23         23.  At some time in late summer of 2005, Popov decided

24   to file for bankruptcy.  To protect his interest in his Smart

25   Alec's shares from his creditors, he drafted a share purchase

26   agreement between himself and Dodson, which they backdated to April

27   18, 2004.  See Pl.'s Ex. 2 ("SPA").

28         24.  The only consideration set out in the SPA was

**United States District Court**
For the Northern District of California

$12,500, payable in three payments: $5000 due on April 18, 2004, $5000 due before December 31, 2004, and $2500 due before March 31, 2005. Id. at 1. Although it is clear that Dodson wrote three checks in the correct amounts dated April 18, 2004, November 16, 2004, and January 18, 2005, Def.'s Ex. 601, the Court believes that these checks represented the personal loans that Dodson made to Popov during this period, see FF ¶ 14,[6] and not payments made under the SPA. The Court finds that the payment schedule set out in the SPA was written to coincide with the dates of these loan checks, so as to make it appear as though the SPA was supported by consideration from Dodson.

25. Popov filed for bankruptcy on September 6, 2005. See Bankruptcy Petition. He indicated that his creditors' claims against him exceeded $1.2 million. Id. at 3.

26. YKF and its employees first discovered the transfer of shares from Popov to Dodson in late 2005, through Popov's bankruptcy filings. (test. of Baymiller); (test. of Ezaki). In early October of 2005, Popov and Baymiller discussed the transaction, and Baymiller asked Popov to explain the situation to him in writing. Pl.'s Exs. 72 ("10/5/05 Email"). Popov claimed that he transferred his entire ownership interest to Dodson in order to motivate her to perform well in her position with Smart Alec's. Pl.'s Ex. 73 ("10/9/05 Email").

27. On July 30, 2007, the judge presiding over Popov's bankruptcy proceeding authorized and approved the bankruptcy trustee's assignment, to YKF, of the right to bring a suit against

---

[6] This Order will use "FF" to refer to the paragraphs in the Findings of Fact section, Part II.

1  Dodson to avoid and recover the allegedly fraudulent transfer of

2  shares for $30,000.  Pl.'s Exs. 3, 4.

3  **C.  <u>Smart Alec's Redemption of YKF's Shares</u>**

4  28.  As early as January of 2006, George Pretty

5  ("Pretty"), an attorney who represented YKF during much of its

6  business with Smart Alec's, informed Popov that the transfer of

7  shares from Popov to Dodson may be considered a default under the

8  Settlement Agreement, and that YKF may foreclose on the shares and

9  on the restaurant's assets because of that default.  <u>See</u> Ex. 76

10  (1/17/06 Email) at 3; (test. of Pretty).

11  29.  By mid-July of 2006, Smart Alec's, under Dodson's

12  management, had sent a total of $305,934.33 to an account

13  maintained by Baymiller that was intended to go towards the

14  redemption price for the Smart Alec's shares that were owned by

15  YKF.  Pl.'s Ex. 78 ("7/19/06 Email") at 1, 3.

16  30.  At some point after learning of the transfer of

17  shares between Popov and Dodson, YKF began seeking to secure a

18  leasehold deed of trust on the space used by Smart Alec's, which

19  represented the restaurant's single most valuable asset.  (test. of

20  Pretty).  Although Popov was obliged to secure the leasehold for

21  YKF under the Settlement Agreement, he had never done so.  <u>Id.</u>  YKF

22  was able to receive the leasehold deed of trust in June of 2006.

23  <u>Id.</u>

24  31.  By letter dated July 17, 2006, attorneys for YKF

25  informed Smart Alec's, Dodson, and Popov that YKF considered

26  Popov's transfer of shares to Dodson to be a violation of section

27  5(b) of the Pledge Agreement, and therefore a default under the

28  Settlement Agreement.  Pl.'s Ex. 77 ("7/17/06 Letter") at 1.  YKF

12

declared the balance of Smart Alec's obligations under the Settlement Agreement to be immediately due and payable.  Id.

32.  Dodson sought to exercise her rights under section 1(d) of the Stock Redemption Agreement, which permitted alternative methods by which parties to the Settlement Agreement could pay off the purchase price for the share redemption.  See 7/19/06 Email at 1; Stock Redemption Agreement § 1(d).  Dodson and counsel for YKF thereafter began working on an agreement for the accelerated redemption of YKF's shares.

33.  On October 3, 2006, YKF filed with the recorder for the County of Alameda a Notice of Default and Election to Sell Under Deed of Trust as to Smart Alec's under the leasehold deed of trust.  Pl.'s Ex. 92 ("Notice of Default").

34.  In early October, Dodson made an offer to simply purchase (rather than redeem) YKF's shares, so that she could assume YKF's rights to foreclose on the majority shares.  Pl.'s Ex. 90 ("10/06/06 Email") at 1.  By this time, her counsel informed YKF that Summit Bank had agreed to loan her funds.  Id.

35.  In late November and early December, the parties were still working out the details of the transaction -- for example, whether it would be possible for Dodson to purchase YKF's position to preserve the power to foreclose, and whether an alternative escrow account could be set up to accommodate the sale. See, e.g., Pl.'s Exs. 95, 97.

36.  Summit Bank committed to the loan for the

1   transaction on December 18, 2006.  (test. of Jon Vaught)[7]; Pl.'s

2   Ex. 101 ("12/18/06 Email") at 2.

3          37.  On January 5, 2007, YKF informed Dodson, for the

4   first time, that it would also be seeking interest from the date of

5   the Notice of Default (July 17, 2006), and attorney fees in

6   connection with the default.  Pl.'s Ex. 104 ("1/5/07 Letter") at 1-

7   2.  This totaled roughly $48,256.  Id.

8          38.  Dodson objected to the additional fees.  Pl.'s Ex.

9   105 ("1/11/07 Fax").  However, she also continued to express an

10  interest in purchasing YKF's position (and its power of

11  foreclosure) rather than paying off the amount under the Stock

12  Redemption Agreement.  Pl.'s Ex. 108 ("1/29/07 Email").

13         39.  On February 15, 2007, YKF informed Dodson that it

14  would decline to sell Dodson its position for the amount that the

15  parties had been discussing, since it concluded that it was already

16  entitled to that amount as a result of Smart Alec's default, and

17  that the right to foreclose upon the shares and extinguish Triano's

18  potential claim would be of considerable value to Dodson.  Pl.'s

19  Ex. 109 ("2/15/07 Email") at 1.  Dodson then declined to pay

20  additional money to purchase YKF's position, and elected instead to

21  "pay off the note and be done with it."  Pl.'s Ex. 110 ("2/20/07

22  Email") at 1.

23         40.  On February 21, 2007, YKF filed a Notice of

24  Trustee's Sale, setting a sale date of March 20, 2007.  Pl.'s Ex.

25  111 ("Notice of Trustee's Sale").

26         41.  On March 12, 2007, the parties entered a Closing

27  _____

[7]  Jon Vaught ("Vaught") was the attorney who represented Dodson
28  during the redemption negotiations, and he testified for Dodson at
    trial.

14

Agreement re Payoff of Secured Redemption Promissory Note. Pl.'s Ex. 121 ("Closing Agreement"). Dodson or Smart Alec's paid a total of $88,072.37 in attorney's fees and interest accumulated since the Notice of Default had been filed. See id. at 1-2; (test. of Dodson).

42. The shares that were not redeemed as part of the agreement, which are owned by Dodson, were turned over to Summit Bank as security for a loan of $420,000, which financed the Closing Agreement, and which Dodson and Smart Alec's have both guaranteed. (test. of Dodson); Def.'s Ex. 591 ("Business Loan Agreement"), 592 ("Summit Promissory Note").

43. Summit Bank still possesses the physical certificates for Dodson's shares, and holds them as security for its loan. (test. of Dodson).

### D. Triano's Promissory Note

44. When Popov approached LOMT to secure representation for the Hayashi Litigation in October of 2001, he signed a fee agreement for the representation. PI Ex. 301;[8] (test. of Byrne).[9] The fee agreement set out hourly billing rates, and it identified the scope of representation as the "recovery of property" matter related to Barry Bonds' record-breaking baseball. Id. at 1, 5. It also provided Triano with "a lien on any and all claims or causes of action that are the subject of the Attorney's representation under this Contract." Id. at 2.

---

[8] This Order will use the prefix "PI" (for "Plaintiff-Intervenor") to designate exhibits presented by Triano.

[9] Mark D. Byrne ("Byrne") is an attorney who works at LOTM, who represented Popov during the Hayashi litigation, Man.com litigation, and YKF litigation.

45.  While the Hayashi litigation was still ongoing, Popov was sued in the Man.com litigation, which involved allegations that Popov had committed fraud in connection with a failed dot-com enterprise. (test. of Popov; test. of Triano).  In January of 2002, Popov asked LOMT to represent him in the Man.com litigation, and because the matter was scheduled to go to trial in March or April of 2002, LOMT "jumped right in." (test. of Triano). LOMT and Popov never executed a fee agreement for the Man.com litigation. (test. of Triano; test. of Byrne).

46.  Around March of 2002, Triano began discussing with Popov his concern regarding Popov's payment, and ability to pay, the accumulating attorney fees. (test. of Triano).  Because the parties were in frequent contact regarding the Hayashi and Man.com litigation, it is not now clear exactly when these discussions occurred.  Id.  At some point, Triano stated that LOMT would require some security for the accumulating legal fees, and in late March or early April, Triano and Popov began discussing the use of Popov's shares in Smart Alec's as security.  Id.

47.  LOMT provided Popov with a copy of a Promissory Note on April 15, 2002.  PI Ex. 304 ("Promissory Note"); (test. of Byrne; test. of Triano).  Byrne went through the Promissory Note with Popov and pointed out its various provisions, including a provision that instructed Popov of his right to seek the advice of separate counsel before he agreed to its terms. (test. of Byrne). He specifically told Popov that Popov should seek the advice of an attorney, Gene Farber, whom Popov had previously worked with in relation to the Man.com litigation.  Popov took the Promissory Note home with him, and returned to LOMT with it on April 17, 2002.  Id.

Popov signed the Promissory Note at that time.  Promissory Note at 2, 3.

48.  The Promissory Note states that it is for $45,648.54.  Id. at 1.  This figure represents the total charges that accumulated as of April 1, 2002, in both the Hayashi and Man.com Litigation, when taken together with a $10,000 write-off applied to Popov's account on April 1 in the Man.com litigation. Id. at 1; PI Ex. 306 ("Proof of Claim") Ex. C ("Hayashi Bills") at 46; Def.'s Ex. 513 ("Man.com March Bill") at 1, 8.  The Promissory Note covers this total "together with such additional sums which may accrue from legal services being provided by the [sic] Martin F. Triano dba Law Offices of Martin Triano."  Promissory Note at 1. The Note is secured by "All shares held in Smart Alecs Restaurant [sic]."  Id.  The Promissory Note also states that, in the event that LOMT brought any action to enforce the Promissory Note (including foreclosure), the prevailing party would be entitled to attorney fees.  Id. at 2.

49.  Popov claims that when he signed the Promissory Note in April of 2002, the first page (which does not contain his signature) stated that the Promissory Note only covered the attorney fees related to the Man.com matter.  He claims that Triano has since altered the first page of their agreement in order to assert a security interest in Popov's Smart Alec's shares for the fees accumulated in the Hayashi Litigation.  (test. of Popov). Popov does not have a copy of the Promissory Note that he claims to have signed.  Triano and Byrne both contend that the Promissory Note produced at trial, which clearly covers fees for both the Hayashi and Man.com litigation, is a true and correct copy of the

17

1  Promissory Note that Popov signed. (test. of Triano; test. of

2  Byrne). Aside from Popov's testimony, which this Court finds to

3  lack credibility, there is no evidence to suggest that the

4  Promissory Note has been altered in any way material to this

5  litigation since Popov signed it.[10]  The Court finds that Popov

6  signed the Promissory Note that was produced at trial, which covers

7  fees for both the Hayashi and Man.com litigation.

8       50.  The Man.com litigation was ultimately resolved in

9  Popov's favor, (test. of Popov; test. of Triano), and LOMT ceased

10  billing hours for the Man.com litigation in July of 2002. Def.'s

11  Ex. 517 ("Man.com July Bill") at 2.  In August of 2002, Popov fully

12  paid LOMT the legal fees due for work performed in connection with

13  the Man.com litigation. Def.'s Ex. 518 ("Man.com August Bill") at

14  1.

15       51.  In August of 2002, LOMT began representing Popov,

16  Dodson, and Smart Alec's in the dispute that had arisen with YKF

17  regarding certain uses of Smart Alec's funds (this is the dispute

18  that eventually resulted in the Settlement Agreement of February,

19  2004, between YKF on the one hand and Popov, Dodson, and Smart

20  Alec's on the other). (test. of Triano); Proof of Claim Ex. E

21

22  _____

[10] It is clear that LOMT did waive certain rights that were
23  included in the original Promissory Note, such as a requirement
    that Popov use his shares to place Triano on the board of Smart
24  Alec's, and a requirement that Triano be periodically apprised of
    the restaurant's significant business developments. There are
25  several different versions of the Promissory Note that have these
    provisions crossed out, but although the specific markings on these
26  amended copies differ from copy to copy, the underlying text and
    substance of the Promissory Note has not changed. See PI Ex. 305;
27  Def.'s Ex. 538 at 5-6. The Court does not believe that there was
    ever a version that covered solely the fees for the Man.com
28  litigation, to the exclusion of fees for the Hayashi litigation.

18

("YKF Bills") at 1.[11]

52.  In late 2002, the court in the Hayashi Litigation ordered that the baseball be sold in auction, and that Popov receive fifty percent of the proceeds.  This amounted to $225,000. (test. of Popov).

53.  When Popov finally discharged LOMT in May of 2003, Popov still owed Triano a substantial amount of money for the Hayashi Litigation (bills issued by LOMT stated the amount as $473,402.65).  See Hayashi Bills at 157.  When Popov filed for bankruptcy in September of 2005, he still owed Triano the same amount.  Proof of Claim Ex. A ("Statement of Claim") at 2.

54.  Popov's share of the baseball proceeds were held in escrow, until they were paid towards Triano's claims against him by the bankruptcy court.  (test. of Triano; Test. of Popov).  A total of $238,192.75 was paid to Triano as a secured creditor.  See Pl.'s Ex. 131 ("Trustee's Report of Distribution") at 2.

## III.  CONCLUSIONS OF LAW

### A.  Fraudulent Transfer

YKF asserts a number of different causes of action to avoid and recover the fraudulent transfer of Smart Alec's shares between Popov and Dodson.  YKF Compl. ¶¶ 12-32.  The Court begins its discussion with YKF's claim that Popov and Dodson violated

---

[11] Popov alleges that Triano's claimed security interest in Smart Alec's created a conflict of interest, such that he could not ethically represent the company, Dodson, or Popov in the YKF Litigation.  (test. of Popov).  Because the Court ultimately concludes that the Promissory Note does not include fees accumulated for the YKF Litigation, infra, the Court need not make any findings of fact with respect to this representation.

**United States District Court**
For the Northern District of California

1    California Civil Code section 3439.04 ("section 3439.04").  YKF

2    Compl. ¶¶ 21-22.  Having purchased from the bankruptcy trustee the

3    right to bring suit to recover the shares, YKF can assert this

4    cause of action as a creditor under 11 U.S.C. § 544(b)(1).  See

5    Kupetz v. Wolf, 845 F.2d 842, 845 (9th Cir. 1988) ("Section 544(b)

6    of the Bankruptcy Code permits the Trustee to stand in the shoes of

7    a creditor to assert any state law claims that a creditor may

8    have.").

9        Under section 3439.04, "[a] transfer made or obligation

10   incurred by a debtor is fraudulent as to a creditor . . . if the

11   debtor made the transfer or incurred the obligation . . . [¶]

12   [w]ith actual intent to hinder, delay, or defraud any creditor of

13   the debtor."  Cal. Civ. Code § 3439.04(a).  Fraudulent intent under

14   this section may be proven on the basis of circumstantial evidence.

15   See AFI Holding, Inc. v. Mackenzie, 525 F.3d 700, 704 (9th Cir.

16   2008).  The section recounts a number of helpful factors that "may"

17   be given consideration; this list "is meant to provide guidance to

18   the trial court . . . ."  Filip v. Bucurenciu, 129 Cal. App. 4th

19   825, 834 (2005).  The factors include:

20           (1) Whether the transfer or obligation was to an
             insider.
21
             (3) Whether the transfer or obligation was
22           disclosed or concealed.

23           (4) Whether before the transfer was made or
             obligation was incurred, the debtor had been sued
24           or threatened with suit.

25           (8) Whether the value of the consideration
             received by the debtor was reasonably equivalent
26           to the value of the asset transferred or the
             amount of the obligation incurred.
27
             (9) Whether the debtor was insolvent or became
28           insolvent shortly after the transfer was made or

**United States District Court**
For the Northern District of California

the obligation was incurred.

    (10) Whether the transfer occurred shortly before
    or shortly after a substantial debt was incurred.

Cal. Civ. Code § 3439.04(b).

The transfer in this case was made to an insider. The Ninth Circuit has recognized that "a special relationship between the debtor and the transferee" is one of the "more common circumstantial indicia of fraudulent intent." In re Acequia, Inc., 34 F.3d 800, 806 (9th Cir. 1994) (italics omitted) (quoting Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254 (1st Cir. 1991)). This can include a "family, friendship, or close associate relationship." Max Sugarman Funeral Home, 926 F.2d at 1254 (quoting In re May, 12 Bankr., 618, 627 (N.D. Fla. 1980)). At the time the transfer was made, Dodson was a person who was deeply involved in Smart Alec's, and at the very least, a long-time friend of Popov. FF ¶¶ 3-5. Dodson and Popov both claimed that their romantic relationship ended in early 2004 and did not begin again until the end of 2005 -- even if this testimony is to be believed, there can be no doubt that they retained a close relationship during this period, as Dodson loaned Popov as much as $13,000 over this period and never required repayment. Id. ¶ 14.

The transfer clearly occurred in the shadow of a lawsuit against Popov by Triano, and at a time when Popov was insolvent. In correspondences from Popov in the months leading up to his bankruptcy, he indicated: "If I cannot come to an agreement with Triano in the next couple of weeks I may file personal bankruptcy." Id. ¶ 18; 6/20/05 Email at 1. Moreover, Popov reported that he had either no income or little income after he left Smart Alec's

21

1    payroll in April of 2004.  FF ¶ 13.  His debts were significant.

2    Id. ¶ 25.

3        The transfer occurred without reasonable consideration.  This

4    Court finds that the transfer occurred for exactly no

5    consideration.  Id. ¶ 24.  Although the SPA references three

6    payments totaling $12,500, this was merely a reference to prior

7    loans made by Dodson to Popov, which were recharacterized to create

8    the illusion of consideration.  Id.  Even assuming that the $12,500

9    payment schedule set out by the SPA was an accurate statement of

10   consideration, this amount was not significant in relation to the

11   value of the shares.  Smart Alec's was generating significant

12   revenue, which it was using to pay down its redemption obligation

13   to YKF.  Id. ¶ 28.  Even though the shares were encumbered by YKF's

14   lien, and a purported interest by Triano, Popov had claimed that

15   both he and Dodson were "confident that we can repay this amount

16   within the specified timeframe."  Id. ¶ 10; 11/18/03 Letter at 3.

17   The Court does not believe that Dodson and Popov could have

18   reasonably valued the shares at only $12,500.

19       Finally, assuming arguendo that the share transfer took place

20   in April of 2004, as Popov and Dodson contend, the transfer of

21   shares was deliberately hidden from others.  Id. ¶¶ 17-22.  Neither

22   Popov nor Dodson claim to have told anyone about the transfer for

23   more than a year after it took place, and even then, the only

24   disclosures that they claim to have made (to Baymiller and Ezaki)

25   are disputed and disbelieved by this Court.  Id. ¶¶ 17, 20.  It is

26   much more likely that the transaction occurred in August of 2005,

27   while Popov was preparing to file for bankruptcy, and the SPA was

28   fraudulently backdated to reduce the impact of the suspicious

United States District Court
For the Northern District of California

timing of the transaction.[12]  Id. ¶¶ 23-24.  In either case, the surreptitious nature of the transaction is a clear and compelling indicator of fraud.

"The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose."  In re Acequia, Inc., 34 F.3d at 806.  Dodson provides an alternative explanation for the transfer of stock, in an attempt to put a legitimate face on the transaction.  She claims that after entering the Settlement Agreement in early 2004, Popov wished to provide Dodson with an incentive to continue working with Smart Alec's, both to help Dodson and to help the restaurant wipe out his personal guarantee for the first $285,000 of the redemption amount to YKF.  While this account is not wholly implausible, it is not credible.  Popov transferred 100% of his interest in the restaurant.  Popov could have provided Dodson an incentive to work hard at Smart Alec's by transferring a smaller percentage of his interest in the shares.  The Court does not believe that he would have entirely walked away from his interest in April of 2004, just after he had spent over a year trying to protect that interest through settlement negotiations with YKF.  Dodson's explanation is also inconsistent with the fact that neither Dodson nor Popov discussed the

---

[12] Dodson argues that the bankruptcy court previously resolved this issue, and this Court may not revisit it because of the doctrine of collateral estoppel.  The Court does not accept this argument, as it was not raised until Dodson's closing arguments after trial. "Res judicata and collateral estoppel [issue preclusion] are affirmative defenses that must be pleaded."  Rivet v. Regions Bank, 522 U.S. 470, 476 (1998) (quoting Blonder-Tongue Lab. v. Univ. of Ill. Found., 402 U.S. 313, 350 (1971)) (brackets in Rivet).

transaction with anybody until after Popov filed for bankruptcy in the fall of 2005.

The Court finds that YKF has met its burden of establishing that Popov intended to hinder, delay or defraud his creditors, and there is no "significantly clear" evidence of a legitimate purpose behind the transfer.

YKF also claims that they can recover against Dodson under 11 U.S.C. § 548(a)(1)(A), which allows a bankruptcy trustee (or in this case, a party that has purchased the relevant rights of a trustee) to:

> avoid any transfer . . . of an interest of the debtor in property . . . , that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily [¶] made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was . . . indebted . . . .

11 U.S.C. § 548(a)(1). The federal bankruptcy law uses the same language as California's fraudulent transfer provision: Both statutes define "an actually fraudulent transfer as one made with 'actual intent to hinder, delay, or defraud a creditor.'" In re Turner, 335 B.R. 140, 145 (Bankr. N.D.Cal. 2005). The Ninth Circuit has referred to § 548(a)(1) as the "analog" to § 3439.04(a). AFI Holding, 525 F.3d at 704. The Court has already found that Popov and Dodson entered into the transfer with the actual intent to deprive Popov's creditors of access to the Smart Alec's shares. YKF has therefore met its burden of proving that the transfer of shares from Popov to Dodson is voidable.

The Court therefore finds that judgment for YKF on YKF's first and second causes of action for fraudulent transfer is

United States District Court
For the Northern District of California

appropriate.[13]  The transfer of shares between Popov and Dodson is void, and any interest that Dodson now holds in the Smart Alec's shares at issue is hereby transferred to YKF.  Although YKF has requested additional relief, preventing Dodson from dissipating the shares, or frustrating the transfer of the restaurant or the shares, YKF Trial Br. at 9, the Court is not persuaded that any specific involvement by the Court is necessary at this time.  Should any party engage in behavior that interferes with the resolution and execution of the terms of the Judgment in this matter, the parties may seek redress at that time.

## B.  Dodson's Counterclaim

Dodson claims that YKF, deliberately and in bad faith, delayed closing the redemption transaction with Dodson in 2006 and early 2007, thereby forcing Dodson to incur additional interest and attorney fees to which YKF was not entitled.  Adv. Docket No. 6 ("Dodson Answer") at 7-8.  The Court finds that Dodson has not met her burden of showing that any of the fees demanded by YKF were unwarranted under the Settlement Agreement, or that the delay by YKF was in bad faith.

YKF was entitled to file a Notice of Default after it learned of the transfer of shares from Popov to Dodson, because the Settlement Agreement explicitly states that Popov's transfer of shares would constitute a default.  See Stock Pledge Agreement § 5(b) ("Pledgor will not . . . transfer . . . the Collateral.");  Settlement Agreement § 12(d) (stating that breach of Stock Pledge

---

[13] Because the Court finds YKF's first two causes of action to be meritorious, it need not reach YKF's alternative theories.  This includes YKF's third cause of action under 11 U.S.C. § 548(a)(1)(B), and YKF's fourth cause of action under 11 U.S.C. § 544(b)(1) and California Civil Code § 3439.05.

**United States District Court**
For the Northern District of California

Agreement and other agreements would constitute default of
Settlement Agreement). The balance became due at that time.
Settlement Agreement § 13. YKF was entitled to interest from the
date of default, because, "[i]f a contract . . . does not stipulate
a legal rate of interest, the obligation shall bear interest at a
rate of 10 percent per annum after a breach." Cal. Civ. Code
§ 3289(b). Moreover, YKF was entitled to fees under the Settlement
Agreement, which stated that Smart Alec's had to pay for expenses
incurred to compel payment. See Stock Redemption Agreement Ex. A
("Secured Redemption Promissory Note") § 6(e). This is the
position that YKF took when it demanded these fees from Dodson, see
1/5/07 Letter at 1-2, and Dodson has not presented any contrary
arguments to show that these demands were unlawful. The Court does
not accept Dodson's argument that the transfer was not a default
simply because it was "harmless." The Court declines to rewrite
the contract to allow for such an exception to the Settlement
Agreement's prohibition on transference.

Dodson has also failed to show that any delay by YKF was due
to bad faith. Instead, the evidence indicates that for much of the
alleged "delay," the parties were in fact still working out the
details of the transaction. In particular, the correspondences
reflect a continued interest by Dodson not just to redeem the
shares as set out in the Settlement Agreement, but to purchase
YKF's position so that she could go forward with the foreclosure on
the shares and eliminate Triano's claimed security interest in the
shares. FF ¶¶ 34-35,38-39.

Finally, even assuming arguendo that Dodson has stated a
plausible claim on these facts, she has not shown that she has been

personally damaged by YKF's alleged delays. Instead, it is not clear how much of the fees and interest were paid by Smart Alec's, and how much were paid personally by Dodson. At best, Dodson has established that she, jointly and severally with Smart Alec's, had to borrow an additional $88,072.37 from Summit Bank. At this time, any suggestion that Summit Bank may actually seek to collect this from her remains mere speculation. If it does not, or if it is able to collect from Smart Alec's, then Dodson's recovery would be a windfall. This failure to establish damages to a certainty also defeats Dodson's claim.

## C. **Triano's Declaratory Judgment Claim**

Triano requests that this Court formally recognize the lien in the shares of Smart Alec's that Popov held in April of 2002, established by the Promissory Note. Triano Trial Br. at 2. Triano claims that the Promissory Note is secured by the shares, and covers the total remaining balance for fees accrued through Triano's representation of Popov in three different matters: the Hayashi litigation, the Man.com litigation, and the YKF litigation. On its face, the Promissory Note covers the fees accumulated in the Hayashi litigation and the Man.com litigation as of April 1, 2002, and purports to extend to "such additional sums which may accrue from legal services being provided by the Martin F. Triano dba Law Offices of Martin Triano." Promissory Note at 1; FF ¶ 47. Triano's claim raises several legal issues, which the Court addresses in turn below.

### 1. Res Judicata

Triano claims that he has already vindicated his lien on the shares by filing a proof of claim during Popov's bankruptcy, which

went unopposed. Triano Trial Br. at 13-14. According to Triano, his unopposed claim has a res judicata effect as to the validity of the lien and the amount claimed. Id. at 14-19. "The doctrines of res judicata and collateral estoppel operate to preclude relitigation of claims or issues in a subsequent action between the same parties or those in privity with them." A & A Concrete, Inc. v. White Mountain Apache Tribe, 781 F.2d 1411, 1417 (9th Cir. 1986) (citation omitted). If Triano is correct, then this Court is bound by the claim filed in the bankruptcy proceeding.

Triano relies heavily upon the case of Seigel v. Federal Home Loan Mortgage Corp., 143 F.3d 525 (9th Cir. 1998). In Seigel, a panel for the Ninth Circuit considered the question of whether a party could challenge a property foreclosure that had been brought by Freddie Mac, where Freddie Mac had filed proofs of claim as to notes and deeds of trust with respect to the property in an earlier bankruptcy proceeding, and where no party to the bankruptcy had objected to the proofs of claim. Id. at 527-28. The panel noted that the allowance or disallowance of a claim in bankruptcy is generally binding, and reasoned that, because a claim that is not objected to is "deemed allowed" under 11 U.S.C. § 502(a), a proof of claim could have a res judicata effect even in the absence of a separate order by the bankruptcy court ruling on the claim in question. Id. at 528, 530.

YKF argues that Triano's proof of claim should not have a res judicata effect. During its closing arguments, counsel for YKF made one particularly compelling point: There was simply no reason to litigate this matter in Popov's bankruptcy proceeding. Due to the fact that Popov had fraudulently transferred the shares to

United States District Court
For the Northern District of California

Dodson prior to filing for bankruptcy, the shares now at issue were not presumed to be a part of the bankruptcy estate. Any interest that Triano had under the Promissory Note was therefore unsecured, and any objection or subsequent litigation over Triano's interest in the Promissory Note would have therefore been largely academic. This stands in stark contrast to the facts in Seigel. In that case, the Ninth Circuit panel observed that the issues raised by the unopposed proof of claim went to "the heart and soul of the bankruptcy." Id. at 531. It was the claimant's asserted debt that had forced the bankrupt into bankruptcy, and therefore the bankrupt "had good reason to exert himself" because "he could have benefitted, and could even have come out solidly solvent had he prevailed." Id.

Put otherwise, the parties to Popov's bankruptcy proceeding simply had no compelling incentive to litigate the enforceability of Triano's Promissory Note in Popov's bankruptcy proceeding. As other circuits have noted, "res judicata should not be applied where one or both parties have 'little motivation' or 'little incentive' to fully litigate an issue." In re Ladd, 450 F.3d 751, 753 (8th Cir. 2006); Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1521 (10th Cir. 1990) ("Often, the inquiry will focus on whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties."); see also Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329-30 (1979) (considering related question of offensive collateral estoppel; noting that it may be unfair to allow estoppel against party who had little incentive to

litigate point in earlier suit). The Court concludes that it would
be unfair to bar Dodson and YKF from litigating Triano's asserted
lien, which is a central aspect of this dispute, simply because no
party objected to it at a time when it was of only hypothetical
interest.

The Court also notes that Triano's decision to raise his res
judicata argument on the eve of trial (and in an offensive posture,
to preclude YKF and Dodson from defending against his claimed lien
in the shares)[14] defeats the very purpose of the doctrine. Res
judicata "has the dual purpose of protecting litigants from the
burden of relitigating an identical issue with the same party or
his privy and of promoting judicial economy by preventing needless
litigation." Parklane Hosiery Co., 439 U.S. at 326. Although
Triano did claim to possess a valid proof of claim in his
complaint, Triano clearly articulated his res judicata argument for
the first time in his pretrial brief, and by this time YKF and
Dodson had little choice but to litigate the entire matter over the
course of the trial. At this point, to apply the doctrine in the
name of judicial economy would be as effective as wishing the
toothpaste back into the tube.

2.   Statute of Limitations

YKF contends that the relevant statute of limitations is set
out in section 337 of the California Civil Code, which creates a
four-year statute of limitations for actions brought under a
written obligation. YKF Trial Br. at 12. The Promissory Note

---

[14] Significantly, if Triano had been asserting his proof of claim
to defend the validity of the Promissory Note, then he would have
been required to include his res judicata theory in his pleadings,
or else they would have been deemed waived. See Fed. R. Civ. P.
8(c).

between Triano and Popov became due on April 30, 2003.  Promissory

Note at 1.[15]  There has been repeated litigation between Triano and

Popov (and Dodson and Smart Alec's) over the last seven years -- in

particular, Triano has raised a claim for declaratory relief

against Dodson as to the Promissory Note in a suit filed in Alameda

County Superior Court on April 26, 2007, and the parties have

represented to this Court that the suit ("Alameda Action") is

ongoing.  On September 5, 2007, several months after the statute of

limitations on the Promissory Note had expired, YKF filed the suit

that is now before this Court, and Triano first sought to intervene

in this action on November 11, 2007, before the matter was

transferred here from bankruptcy court.  See YKF Compl.; Adv.

Docket No. 12 ("First Triano Mot. to Intervene").

The Court notes that it would have been impossible for Triano

to intervene in the present suit before the statute of limitations

had run on the Promissory Note.  Triano had brought a timely

declaratory judgment against the party who ostensibly held the

shares (Dodson) in the Alameda Action, and only after that, and

after the statute of limitations had expired, did YKF file this

suit to undo the fraudulent transfer by which Dodson had received

those shares.  Given these peculiar facts, this Court deems the

statute of limitations tolled for the purpose of the immediate

suit.  "In certain circumstances . . . a California court will give

effect in the action before it to the tolling of the statute of

limitations in an action pending in another forum."  Rumberg v.

---

[15] Triano argues that no breach actually occurred until Popov
discharged Triano on May 14, 2003.  Triano Trial Br. at 20.  While
this Court disagrees, the difference between these dates is
immaterial, as both dates were more than four years prior to
Triano's efforts to intervene in this matter.

Weber Aircraft Corp., 424 F. Supp. 294, 299 (C.D. Cal. 1976).
Indeed, "courts have adhered to a general policy which favors
relieving plaintiff from the bar of a limitations statute when,
possessing several legal remedies he, reasonably and in good faith,
pursues one designed to lessen the extent of his injuries or
damage." Addison v. State, 21 Cal. 3d 313, 317-18 (1978). The
doctrine of equitable tolling can be invoked when "a first action,
embarked upon in good faith, is found to be defective for some
reason." McDonald v. Antelope Valley Community College Dist., 45
Cal. 4th 88, 100 (2008). This doctrine may apply wherever there is
"timely notice, and lack of prejudice, to the defendant, and
reasonable and good faith conduct on the part of the plaintiff."
Id. at 102.

YKF clearly bought and brought this cause of action with full
knowledge of Triano's claim in the shares.[16] FF ¶¶ 18,22. There
is no indication that YKF will be prejudiced by tolling the
limitations period, or that Triano acted in bad faith when it
brought suit against Dodson before the statute of limitations
expired. At this stage, it is not clear to this Court whether or
not Triano will be able to vindicate his lien through the Alameda
Action, given YKF's newly-proven interest in the shares that this
Court recognizes by this Order. In the face of this uncertainty,
it would be unjust for this Court to offhandedly deny Triano his
requested relief in spite of his diligence in filing the Alameda

---

[16] It is indisputable that YKF has known about Triano's asserted
interest in the shares well before it brought this suit, or
purchased the right to bring this suit. Indeed, the Settlement
Agreement, entered into in February of 2004, clearly reflects that
YKF was cognizant of Triano's claim, as it made explicit allowances
for Triano's interests. See Stock Pledge Agreement § 5(b).

**United States District Court**
For the Northern District of California

Action, the lack of prejudice to YKF, and YKF's long-standing awareness of Triano's claim.[17]  The Court finds that the statute of limitations must be tolled for the sake of the present trial.

3.  <u>Compliance with the Rules of Professional Conduct</u>

Because the Promissory Note purports to grant Triano a security interest in Popov's Smart Alec's shares, the Promissory Note represents "a business transaction with a client" by which Triano "knowingly acquire[d] [a] . . . security interest adverse to a client . . . ," within the meaning of California Rule of Professional Conduct ("Rule") 3-300.  See <u>Fletcher v. Davis</u>, 33 Cal. 4th 61, 69-70 (2004).  Courts will not enforce such notes between attorneys and their clients, unless the attorney has strictly complied with the requirements of Rule 3-300.  <u>Shopoff & Cavallo LLP v. Hyon</u>, 167 Cal. App. 4th 1489, 1522 (Ct. App. 2009). Such contracts, like attorney fee agreements, should be "strictly construed against the attorney," <u>Alderman v. Hamilton</u>, 205 Cal. App. 3d 1033, 1037 (Ct. App. 1988), because "in civil cases, there are no transactions respecting which courts are more jealous and particular, than dealings between attorneys and their clients." <u>Fletcher</u>, 33 Cal. 4th at 67 (citation, internal quotation marks, and ellipses omitted).  The burden is therefore on the attorney to "refute the presumption of voidability in transactions between an attorney and a client . . . ."  <u>Mayhew v. Benninghoff</u>, 53 Cal. App. 4th 1365, 1370 (Ct. App. 1997).

Rule 3-300 creates the following requirements for this sort of transaction:

---

[17] The Court does not reach the question of whether Triano may be barred by the statute of limitations in any later-filed suits to enforce the Promissory Note.

> (A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and
>
> (B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and
>
> (C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition.

Rule 3-300.

The Court finds that the Promissory Note in this case creates a valid lien against the Smart Alec's shares that Popov held on April 17, 2002. As Byrne testified, he went through the terms of the Promissory Note with Popov, including the requirement that Popov have an opportunity to consult with outside counsel, two days prior to Popov's date of signature. FF ¶ 47. The Court also believes that, when narrowly construed, the terms of the Promissory Note were fair and reasonable to Popov. Given Popov's sophistication and familiarity with similar security instruments, the terms should have been reasonably clear to him. The Court does not believe that a separate written explanation of the terms of the Promissory Note, in addition to the oral explanation provided by Byrne, were necessary.

The Promissory Note is not without its problems, however. On its face, it is ambiguous as to the scope of the representational matters to which it applies. It does not explicitly mention either of the matters that Triano was working on for Popov at the time the Note was executed, i.e., the Man.com litigation and the Hayashi litigation. However, it does state a specific sum that exactly

matched the fees already accrued in both matters as of April 1,
2002. Id. ¶ 48. This lends credibility to the testimony of both
Triano and Byrne, stating that they discussed with Popov the need
for a security interest to cover the legal fees in both suits.
Although Popov claims that Triano already had a security interest
in the subject of the Hayashi litigation, recovery of the baseball
remained uncertain at the time the Promissory Note was executed,
and the Court finds it quite plausible that Triano would seek, and
that Popov would agree to, security for his present and future fees
in both matters. This Court finds that the Promissory Note, when
read with the contemporaneous bills for Triano's services in both
the Hayashi litigation and Man.com litigation, presents compelling
evidence that the parties discussed and agreed to a security
interest to cover the fees for both matters.

Although Triano submitted sufficient evidence to establish
that the Promissory Note covered both the Hayashi litigation and
the Man.com litigation, and that this was sufficiently explained to
and understood by Popov, all other ambiguities in the Promissory
Note must be construed against LOMT. Triano claims that the
Promissory Note also covers the fees accumulated in the YKF
litigation. The Court finds no support for this contention, either
on the face of the Promissory Note or in any of the relevant
testimony. The YKF litigation did not begin until several months
after Popov signed the Promissory Note. Id. ¶ 51. This means that
the parties clearly did not have the matter in mind when the
Promissory Note was drafted or executed. There is no evidence
that, when the parties executed the agreement, anyone disclosed to
Popov that the Promissory Note would extend Triano's interest in

35

**United States District Court**
For the Northern District of California

the shares by any amount accumulated in future matters.   In

addition, the representation that Triano provided in the YKF

litigation was unique, in that Triano was representing not just

Popov, but also Smart Alec's and Dodson.   Id.   It is not clear that

Popov was willing to pledge his shares as security for services

provided to all three parties, without similar pledges from those

parties to defray the risk of foreclosure.[18]

Dodson argues that the Promissory Note is voidable because

there was no fee agreement between Popov and Triano for the Man.com

litigation.   However, Popov has testified that he completely paid

off the debt owed Triano with respect to the Man.com litigation,

and the record clearly confirms this.   FF ¶ 50.   Triano does not

purport that his fees for the Man.com litigation make up any

portion of the lien that he is now seeking to establish.   The Court

therefore need only find that Popov and Triano executed a valid fee

agreement for the Hayashi litigation.   FF ¶ 44.

The Court concludes that Triano has a valid lien on the Smart

Alec's shares that Popov possessed at the time he executed the

Promissory Note, in April of 2002.   The value of this lien may not

exceed the amount owed Triano for the legal representation that

---

[18] The Court does not reach the separate question of whether the Smart Alec's shares attach as security to the additional fees that accumulated in later actions, in which Triano attempted to enforce the Promissory Note against Popov.   The Court does not reach this question because 1) the issue has not been fully briefed by the parties; 2) counsel for YKF conceded in oral argument that, if Triano can establish collection costs that were incurred in connection with appropriate actions against Popov, then the security interest would attach to that, and 3) Triano has not even attempted to prove before this Court the amount accrued in attempting to enforce the Promissory Note.

LOMT provided Popov in connection with the Hayashi litigation.[19]

2

3   **IV.  CONCLUSION**

4        Judgment is entered for Plaintiff Yugen Kaisha, Y.K.F.

5   ("YKF"), and against Defendant Stephanie Dodson ("Dodson"), with

6   respect to YKF's first two causes of action for fraudulent

7   transfer.  The transfer of 3,744,000 shares of Smart Alec's

8   Intelligent Food, Inc. ("the Shares"), from Alexander N. Popov to

9   Dodson, is deemed fraudulent, and is hereby rendered void.  All

10  interest that Dodson possesses in the Shares is hereby transferred

11  to YKF.  YKF's interest in the Shares is subordinate to the

12  interest of Martin Triano d/b/a Law Offices Of Martin F. Triano

13  ("LOMT") and Summit Bank.  The Court need not reach YKF's third or

14  fourth causes of action, as these are alternative theories of

15  recovery.

16       Judgment is entered for Counter-defendant YKF and against

17  Counter-claimant Dodson as to Dodson's counterclaim.

18       Judgment is entered in favor of LOMT as to LOMT's claim for

19  declaratory judgment.  LOMT has a valid lien on the Shares.  The

20  value of this lien may not exceed the amount owed LOMT for the

21  legal representation that LOMT provided Popov in connection with

22  the Hayashi litigation, as described in this Order.  This Court

23

24  [19] The parties have not fully addressed the issue of whether
    Triano's interest should be subordinate to the interest of Summit
25  Bank.  Although Triano argues that Dodson informed Summit of
    Triano's claim before it received its interest in the Smart Alec's
26  shares, see, e.g., Triano Proposed Findings of Fact and Conclusions
    of Law, Docket No. 78, ¶ 33, no testimony to this effect was
27  elicited at trial.  More importantly, Summit Bank is not a party to
    these proceedings.  The Court therefore declines to resolve the
28  question of whether Triano's interest is senior or subordinate to
    the interest held by Summit Bank.

**United States District Court**
For the Northern District of California

does not reach the issue of whether LOMT's lien is junior or senior to the lien held by Summit Bank.

IT IS SO ORDERED.


Dated:  February 19, 2010

_____
UNITED STATES DISTRICT JUDGE